IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

   Plaintiff,

vs.           No. CR 06-267 MCA

IAN A. McLELLAN,

   Defendant.

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS AND REQUEST FOR A *FRANKS* HEARING

**THIS MATTER** comes before the Court on *Defendant Ian McLellan's Motion to Suppress, Request for a Franks Hearing, and Memorandum in Support Thereof* [Doc. 23] filed on June 21, 2006. The Court held a hearing on Defendant's motion in Albuquerque, New Mexico, on September 28, 2006. Having fully considered the parties' submissions, the applicable law, the evidence and the arguments of counsel presented at the hearing, and being fully advised in the premises, the Court denies Defendant's motion based upon the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

1. On January 11, 2006, agents of the Bernalillo County Sheriff's Department executed warrants to arrest Defendant Ian McLellan and search his residence located at #6 Lost Valley Loop in Cedar Crest, New Mexico.

2.     The agents obtained the warrants as a result of affidavits that Deputy Chris Starr of the Bernalillo County Sheriff's Department prepared and presented to the Honorable James F. Blackmer of the Second Judicial District Court for the County of Bernalillo, State of New Mexico on the evening of January 10, 2006.  [Ex. F, G to Doc. 25.]

3.     The affidavits signed by Deputy Starr [Ex. F, G to Doc. 25] contain statements to the effect that:

a.     From approximately September 26, 2005, until January 6, 2006, the Bernalillo County Sheriff's Department received a series of complaints from citizens residing in the neighborhood surrounding Defendant's residence concerning what they perceived as an escalation of threatening or harassing behavior by Defendant;

b.     These complaints contained references to firearms, ammunition, and explosives that the concerned citizens had observed Defendant using or possessing on his property at 6 Lost Valley Loop;

c.     The citizen complaints also referenced erratic behavior by Defendant, where he would rapidly change from being "neighborly" to being "suspicious";

d.     Deputy Starr went to Defendant's residence on September 27, 2005, at which time Defendant told Deputy Starr that he "did enjoy shooting" and that he had a "few guns";

e.     Based on information obtained from his meeting on September 27, 2005, and a review of official law enforcement records, Deputy Starr determined that Defendant had a "confirmed felony conviction for Aggravated Assault on a Federal Officer";

-2-

f.      By December 19, 2005, one of Defendant's neighbors ("CC1") became so concerned about Defendant's threatening behavior that he moved out of his residence and stated he was going to sell it;

g.      Deputy Starr and another deputy went to Defendant's residence again on December 29, 2005, at which time Defendant was hostile toward the deputies and claimed his neighbor had fired bullets at his house;

h.      Deputy Starr observed the bullet holes in Defendant's house, as well as a bullet-ridden steel shelf, but disbelieved Defendant's accusation that the bullet holes came from a neighbor because that neighbor no longer occupied the adjoining property, and there was not a plausible trajectory from the neighbor's property due to a fence;

i.      On January 6, 2006, an improvised explosive device was found "at the driveway entrance to 6 Lost Valley Lp.," with "a fuse that had been lit but burned out prior to detonation";

j.      Based on the deputy's training and experience (which is detailed in the affidavits), "firearms, ammunition and related items are kept in the homes and vehicles of the owners and users for months or years after acquiring them."

4.      The search warrant affidavit also identifies with particularity the items to be seized in the search (including firearms, ammunition, and materials used in making explosive devices), as well as the places to be searched (Defendant's residence and the outbuildings

and vehicles on its curtilage), and explains the nexus between these items and locations and the crimes Defendant was suspected of committing.[1]  [Ex. F to Doc. 25.]

5.     The affidavits and warrant materials also contain handwritten additions by Judge Blackmer, which indicate (among other things) that Judge Blackmer reviewed the official law enforcement records concerning Defendant's prior felony conviction and identified by name the deputy who reported the explosive device on January 6, 2006.  [Ex. F, G, H, I to Doc. 25.]

6.     Based on his concurrent review of both of Deputy Starr's affidavits, Judge Blackmer approved the warrants permitting the deputies to arrest Defendant and to search and seize property specifically identified therein during the daytime hours on January 11, 2006.  [Ex. H, I to Doc. 25.]

7.     As a result of the execution of the search warrant on January 11, 2006, agents seized a destructive device commonly known as a pipe bomb, approximately 336 grams of an explosive material known as Hodgdon brand Pyrodex powder, and ammunition consisting of an IGMAN .50 caliber cartridge, as charged in the *Superseding Indictment*.  [Doc. 35.]

8.     On February 7, 2006, Defendant was indicted in the United States District Court for the District of New Mexico on one count of possessing an unregistered firearm (namely, a pipe bomb), and one count of being a felon in possession of explosive material;

---

[1]At the hearing on September 28, 2006, Defendant's counsel did not present evidence or argument in support of the proposition that any portions of the search warrant did not satisfy the Fourth Amendment's particularity requirement or otherwise required the type of severability analysis articulated in United States v. Sells, No. 04-5167, 2006 WL 2678015 (10th Cir. Sept. 19, 2006).

the indictment was later superseded to include an additional count of being a felon in possession of ammunition.  [Doc. 10, 35.]

9.     On June 21, 2006, Defendant filed a motion to suppress the evidence and statements obtained as a result of the above search and arrest on the grounds that the affidavits used to support the warrants misstate or omit information that would dispel the deputy's suspicions that criminal activity was afoot and preclude a determination of probable cause.  [Doc. 23.]

10.     In conjunction with his motion to suppress, and in support thereof, Defendant has submitted a number of exhibits (A through N), including an affidavit from his spouse, Mary McLellan, stating that:

a.     She and Defendant have resided at #6 Lost Valley Loop, Cedar Crest, New Mexico since 1999;

b.     Defendant, his son, and his son's friends engaged in pellet gun and paintball games on the property at #6 Lost Valley Loop on several occasions;

c.     Sheriff's deputies were aware that such games occurred on Defendant's property because at least two deputies came to investigate a paintball game in the Spring of 2005, and Ms. McLellan called the Sheriff's office on at least two other occasions to advise them of impending paintball games;

d.     Ms. McLellan was present on August 16, 2005, when a new neighbor named Charles Ervin was invited to Defendant's home, and therefore she believes that Mr. Ervin is the "Concerned Citizen number 1 (CC1)" identified in Deputy Starr's affidavits;

e.      Ms. McLellan subsequently became aware of a feud between Defendant and Mr. Ervin, which resulted in the filing of complaints with the Sheriff's office on November 9, 2005, and on November 25, 2005, alleging that Mr. Ervin was trespassing on Defendant's property, harassing his family, and possibly firing at Defendant.  [Ex. B to Doc. 25.]

11.     The exhibits accompanying Defendant's motion to suppress also include the following documents:

a.      a police report stating that on or about January 7, 2000, Deputy Vickers of the Bernalillo County Sheriff's Department found Defendant on the premises of a liquor store with a slight odor of alcohol on his breath; Defendant was carrying a pellet gun holstered on his right hip at the time, and the pellet gun so closely resembled a regular firearm that the deputy though it was the latter type of gun until he removed it from the holster [Ex. A to Doc. 25];

b.      police reports dated September 20, 2005; November 9, 2005; and November 25, 2005, documenting various complaints and visits to Defendant's residence by Sheriff's deputies concerning the dispute with the neighbor, Mr. Ervin [Ex. C, D, E to Doc. 25.]

c.      a supplement police report by Deputy Starr dated January 11, 2006, stating that, in addition to the events previously reported in the search warrant and arrest warrant affidavits, Defendant had contacted Deputy Starr by telephone on November 4, 2005, to tell him that Defendant had been "tipped off" about a prior search warrant and that

Defendant knew he would "do federal time" if he was found with any "contraband" [Ex. J to Doc. 25];

> d.     a police report stating that on January 6, 2006, Deputy Beatty found an improvised explosive device "on the roadside in front of #6 Lost Valley Loop." [Ex. K to Doc. 25.]

12.     On September 28, 2006, the Court held a hearing on Defendant's motion to suppress, at which time Defendant was afforded an additional opportunity to complete his offer of proof with respect to his claim that the search warrant affidavit misstated or omitted information that has a bearing on the determination of probable cause. [Tr. 9-28-06.]

13.     At the hearing, Defendant rested his offer of proof on his tendered exhibits, including the following:

> a.     a record from the Bernalillo County Sheriff's Department indicating that Defendant's spouse called the Sheriff's Department on or about September 27, 2005, to report that her husband and son were going to engage in paintball activities on that date [Ex. L to Doc. 56];

> b.     an affidavit by Defendant stating that on or about September 27, 2005[2], he invited Sheriff's deputies for a tour of his house, which they declined, and also informed

---

[2]Defendant's affidavit actually lists the date of this conversation as September 27, 2006, but the Court presumes the year indicated on the affidavit is a typographical error since Defendant was already in custody on September 27, 2006.

them that he had replica guns, paintball guns, BB guns, and pellet guns in his house but no firearms [Ex. M to Doc. 56];

        c.    a time line summarizing some of the information in the affidavits and the information in Defendant's offer of proof.   [Ex. N to Doc. 56; Tr. 9-28-06.]

14.    It is undisputed that at all relevant times Defendant has resided at #6 Lost Valley Loop, Cedar Crest, New Mexico.

15.    Defendant's offer of proof fails to make a threshold showing that a further evidentiary hearing is required to determine whether any of the warrants described above are tainted by intentional falsehood or reckless disregard for the truth on the part of the affiant.

16.    Deputy Starr acted in good faith when preparing and executing the warrants described above, and he did not intentionally or recklessly misstate or omit information relevant to the determination of probable cause in those affidavits.

17.    If the deputy's affidavits had included the additional information provided in Defendant's offer of proof, then the addition of that information to the affidavits would not have defeated a finding of probable cause to support the issuance of the warrants signed by Judge Blackmer on January 10, 2006.

18.    Based on the totality of the circumstances, Deputy Starr's affidavits provided a substantial basis for finding probable cause to support the search warrant and the arrest warrant issued by Judge Blackmer on January 10, 2006, and those warrants were not tainted by any violation of the Fourth Amendment.

19.     Based on the totality of the circumstances, the search of Defendant's residence by agents of the Bernalillo County Sheriff's Department on January 11, 2006, did not exceed the permissible scope or duration of the search warrant and was not tainted by any violation of the Fourth Amendment.

## II.    LEGAL ANALYSIS AND CONCLUSIONS OF LAW

The primary issues raised by Defendant's motion to suppress are whether Deputy Starr's affidavits omit or misstate information relevant to the determination of probable cause, and whether these affidavits contain a legally sufficient factual basis to support Judge Blackmer's finding of probable cause to arrest Defendant and search his residence on January 11, 2006.  Defendant also contends that if the search warrant and arrest warrant executed on that date do not meet the requirements of the Fourth Amendment, then all of the incriminating evidence and statements subsequently obtained from Defendant and his residence must be suppressed as "fruit of the poisonous tree."  For the following reasons, I conclude that these contentions are without merit, and therefore Defendant's motion is denied.

My analysis of Defendant's challenge to the affidavits prepared by Defendant Starr on January 10, 2006, begins with the text of the Fourth Amendment to the United States Constitution, which requires that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation."  U.S. Const., amend. IV.  Courts have held that the term "probable cause" is not self-defining, but requires an inquiry based upon common sense informed by the totality of the circumstances found in the particular case.  See United States

v. Mathis, 357 F.3d 1200, 1205 (10th Cir. 2004) (citing Illinois v. Gates, 462 U.S. 213

(1983)).  In determining whether probable cause exists to support a search warrant, a judge's

task

> is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

United States v. Artez, 389 F.3d 1106, 1111 (10th Cir. 2004) (quoting Gates, 462 U.S. at

238).

A judge's decision to issue a warrant is entitled to "great deference" by a reviewing

court.  Gates, 462 U.S. at 236.  Accordingly, a reviewing court "need only ask whether,

under the totality of the circumstances presented in the affidavit, the [issuing] judge had a

'substantial basis' for determining that probable cause existed."  Artez, 389 F.3d at 1111

(quoting Gates, 462 U.S. at 238-39).  This "totality of the circumstances" test specifically

applies to the determination of whether information from an anonymous, unwitting, or

confidential informant can establish probable cause.  See id.  While the informant's

"veracity, reliability, and basis of knowledge are all highly relevant" to such a determination,

"a deficiency in one [factor] may be compensated for, in determining the overall reliability

of the tip, by a strong showing as to the other, or by some other indicia of reliability."  Gates,

462 U.S. at 233.  Thus, when an affidavit is sufficient on its face to establish probable cause

based on the totality of the circumstances, there is generally no need "to reveal the identities

of the individuals providing information to the police;  hearsay from unknown or unnamed

individuals has been recognized as acceptable support for a finding of probable cause."
Mathis, 357 F.3d at 1205.

An exception to this general rule may apply when a finding of probable cause is
dependent on false or misleading information that the affiant has supplied with the
knowledge that it is false or with reckless disregard for the truth.  See Artez, 389 F.3d at
1116.  In order to invoke this exception, a defendant may request an evidentiary hearing to
test the veracity of an affidavit used to support a warrant under the procedural framework
articulated in Franks v. Delaware, 438 U.S. 154, 171-72 (1978).

Under this framework, an evidentiary hearing is not required unless the defendant
alleges deliberate falsehood or reckless disregard for the truth on the part of the affiant, and
those allegations are accompanied by a sufficient offer of proof.  See Artez, 389 F.3d at
1116.  "Allegations of negligence or innocent mistake" are insufficient to warrant an
evidentiary hearing under Franks.  See id.

To support an allegation regarding the affiant's deliberate falsehood or reckless
disregard for the truth, a defendant should provide affidavits of witnesses or satisfactorily
explain their absence.  Such affidavits or explanations should include a statement of
supporting reasons, not merely conclusory denials.  In addition, a defendant seeking an
evidentiary hearing must show that, after the challenged portions of the affidavit are stricken
(or the omitted information is added), the remaining content of the affidavit is not sufficient
to support a finding of probable cause.  See id.; Franks, 438 U.S. at 171.

In this case, Defendant claims that Deputy Starr's affidavits of January 10, 2006, misstate or omit certain information which is relevant to the determination of probable cause. In particular, Defendant challenges the veracity of statements that Deputy Starr attributed to "Concerned Citizen number 1 (CC1)" on the grounds that this informant was in fact Charles Ervin and that Mr. Ervin had a motive to fabricate incriminating allegations about Defendant in order to get Defendant removed from his property and thereby resolve an ongoing neighborhood feud between the two men. Defendant also claims that Deputy Starr omitted relevant information already in the possession of the Sheriff's office, namely: (1) information about replica guns, pellet guns, BB guns, and/or "paintball wars" which could have supported an inference that people were mistaking these items or activities for real firearms; (2) the telephone conversation from November 4, 2005, in which Defendant indicated his awareness that he would "do federal time" if found with any "contraband"; (3) information suggesting that the improvised explosive device found on January 6, 2006, was actually located "on the roadside in front of #6 Lost Valley Loop" or across the roadway from the driveway entrance to that property instead of "at the driveway entrance" as represented in the affidavits; and (4) Defendant's statement inviting Sheriff's deputies to tour his house on or about September 27 2005. According to Defendant, the cumulative effect of this information is to dispel the deputy's suspicions and defeat a showing of probable cause.

I first address Defendant's contentions concerning the veracity of the statements attributed to "CC1." Defendant's offer of proof concerning this issue does not provide

-12-

grounds for concluding that Deputy Starr knowingly falsified his affidavits or recklessly disregarded the truth when preparing them. On the contrary, the unchallenged portions of the affidavits reflect that Deputy Starr made a good-faith effort to corroborate CC1's allegations and to explain why he believed CC1 to be reliable. See United States v. Danhauer, 229 F.3d 1002, 1007 (10th Cir. 2000).

The veracity of crime victims, or crime-scene bystanders, ordinarily is assumed in making determinations of reasonable suspicion and probable cause. See United States v. Blount, 123 F.3d 831, 835 (5th Cir. 1997) (en banc). Nevertheless, police officers "may weigh the credibility of witnesses" and are not required to believe one witness's testimony over that of another in making such a determination. Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1259 (10th Cir. 1998). Another relevant consideration regarding the probable-cause inquiry is whether officers have made a reasonable effort to "'interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all.'" Id. at 1259 (quoting Romero v. Fay, 45 F.3d 1472, 1476-77 (10th Cir. 1995)).

In this case, the affidavits recount the deputies' efforts to corroborate CC1's allegations by means of a consensual encounter with Defendant at his residence on December 29, 2005. Deputy Starr's account of this encounter notes Defendant's accusation that his neighbor had fired bullets at his house (thereby alerting Judge Blackmer to the possibility that the neighbor's allegations were motivated by a "neighborhood feud"), but also explains why Deputy Starr did not believe Defendant's accusation was credible (i.e., the

neighbor no longer resided on the adjoining property and there was no plausible trajectory from that property).  The affidavits at issue in this case also identify a second concerned citizen "CC2," who corroborated some of the first concerned citizen's allegations.

The affidavits state that both concerned citizens gave their names and addresses and are "in good standing with the community."  Thus, Deputy Starr's affidavits do not "rely upon 'the bare report of an unknown, unaccountable informant who neither explained how he knew about the [alleged criminal activity] nor supplied any basis for believing he had inside information about [the suspect].'"  United States v. Tuter, 240 F.3d 1292, 1296 (10th Cir. 2001) (quoting Florida v. J.L., 529 U.S. 266, 271 (2000)).  Rather, this case involves a tip "from . . . known informant[s] whose reputation can be assessed and who can be held responsible if [their] allegations turn out to be fabricated."  J.L., 529 U.S. at 270; accord United States v. Jenkins, 313 F.3d 549, 554-56 (10th Cir. 2002).

In addition, CC1's statements about witnessing Defendant using or possessing firearms, ammunition, or explosives on his property are based on first-hand knowledge and contain some degree of detail with respect to the type of items observed,  as well as the timing and location of such observations.  Such detailed firsthand knowledge is generally recognized as "the surest way to establish a basis of knowledge" for a confidential informant's report when used in a search warrant affidavit.  See generally 2 Wayne R. LaFave, Search and Seizure:  A Treatise on the Fourth Amendment, § 3.3(d), at 152-54 (4th ed. 2004) (collecting cases); see, e.g., Jenkins, 313 F.3d at 554-55; United States v. Bishop,

-14-

264 F.3d 919, 925 (9th Cir. 2001); United States v. Bruner, 657 F.2d 1278, 1297 (D.C. Cir. 1981).

　　　While it is possible that CC1 or other concerned citizens had an interest in expelling Defendant from their neighborhood, and that this interest could have motivated them to embellish their stories, evidence that one or more of these citizens were lying in their reports to the Sheriff's Department does not necessarily mean that Deputy Starr was lying in his affidavits.  To receive a Franks hearing on this issue, "[i]t is not enough to show that the informant lied to an unsuspecting affiant, or that an affiant's negligence or innocent mistake resulted in false statements in the affidavit." United States v. Owens, 882 F.2d 1493, 1499 (10th Cir. 1989) (citing United States v. Orr, 864 F.2d 1505, 1508 (10th Cir.1988), and United States v. Bloomgren, 814 F.2d 580, 584 (10th Cir.1987)).  Thus, "affidavits submitted in support of a Franks-type hearing which attack the informant's reliability and the correctness of the informant's statements 'do not meet the substantial preliminary showing of falsity required by Franks.'" Id. at 1499-1500 (quoting United States v. Barrera, 843 F.2d 1576, 1579 (10th Cir.1988)).

　　　Courts in other circuits have similarly concluded that:  "'[T]he fact that a third party lied to the affiant, who in turn included the lies in a warrant affidavit, does not constitute a Franks violation.  A Franks violation occurs only if the *affiant* knew the third party was lying, or if the affiant proceeded in reckless disregard of the truth.'" United States v. McAllister, 18 F.3d 1412, 1417 (7th Cir.1994) (quoting United States v. Pritchard, 745 F.2d 1112, 1119 (7th Cir.1984)).  These courts have rejected requests for a Franks hearing where

the defendant challenges "only the veracity of statements made by [the informant], not statements made by the warrant affiant Officer." United States v. Jones, 208 F.3d 603, 607 (7th Cir. 2000); see generally 2 Wayne R. LaFave, *supra*, § 4.4(b), at 539 (collecting cases). For these reasons, Defendant's allegations that the informant identified as "CC1" was not credible or reliable do not provide grounds for granting a Franks hearing.

Defendant also contends that Deputy Starr's affidavits deliberately or recklessly omit information already known to the Bernalillo County Sheriff's Department. This contention is without merit, because the omitted information does not establish Defendant's innocence and would not have precluded a finding of probable cause.

In particular, the deputies' knowledge of Defendant's prior involvement with replica guns, pellet guns, BB guns, and "paintball wars" does not preclude the inference that Defendant also was involved with real firearms, ammunition, and/or explosives. In this regard, it is important to note that at the time he prepared the affidavits in January 2006, Deputy Starr was not in the same position as the other deputy who had the opportunity to personally inspect the pellet gun Defendant was wearing in plain view at the liquor store in January 2000. On the contrary, the affidavits indicate that Defendant was hostile to the deputies when they approached him at his private residence on December 29, 2005, and at that time the deputies observed bullet holes in the residence as well as a bullet-ridden steel shelf, which had not been observed on prior visits and were not consistent with replica guns, pellet guns, BB guns, or paintball activity. Defendant also has not shown how the explosive

-16-

device found near the entrance to his driveway in January 2006 is consistent with innocent activity involving replica guns, pellet guns, BB guns, or paintball games.

Further, the concerned citizens' observations reported in Deputy Starr's affidavit refer to Defendant's brandishing of a "black semiautomatic sidearm," another handgun "similar to a 1911 semiautomatic with a silencer," a box of 50 caliber ammunition as well as steel plates that had been shot with "armor piercing" 50 caliber ammunition, an "explosion of great amplitude," and a "large weapon" under a camouflage net, which "appeared to be a rifle or automatic." [Ex. F, G to Doc. 25.] Especially in light of Defendant's hostile or erratic demeanor and the reports of his threats to his neighbors, a finding of probable cause in this situation does not require Deputy Starr's affidavit to conclusively disprove the theory that every one of these alleged items in Defendant's arsenal might have been a replica, pellet gun, BB gun, or piece of paintball equipment.

The probable-cause standard does "'not require the same type of specific evidence of each element of the offense as would be needed to support a conviction.'" United States v. Pollack, 895 F.2d 686, 691 (10th Cir. 1990) (quoting Adams v. Williams, 407 U.S. 143, 148-49 (1972)). Indeed, "[t]he fact that the police did not, at the time of arrest, know exactly what crime had occurred is not relevant, so long as they had probable cause to believe 'an offense' had been committed." United States v. Edwards, 242 F.3d 928, 935 (10th Cir. 2001) (quoting United States v. Maher, 919 F.2d 1482, 1485 (10th Cir. 1990)). Probable cause is an objective standard, and thus the individual officer's subjective belief about

-17-

whether there is probable cause to arrest is not dispositive.  See United States v. Davis, 197 F.3d 1048, 1051 (10th Cir. 1999).

For similar reasons, neither the statement attributed to Defendant in November 2005 about "doing federal time" if found with "contraband," nor the alleged invitation to tour his house in September 2005, have the effect of defeating a finding of probable cause when considered in light of the other, unchallenged portions of the affidavits.  These affidavits, as well as the police reports filed with Defendant's motion, indicate that his behavior was erratic and subject to sudden changes:  sometimes he appeared neighborly and contrite, while other times his demeanor could shift toward hostility and paranoia.  In light of this pattern of erratic behavior and the other information in the affidavits suggesting an irrational fear of being attacked and an obsession with guns, explosives, and warfare, a finding of probable cause does not require Deputy Starr's affidavit to conclusively disprove the theory that Defendant would not have possessed any contraband because, during his lucid moments, he understood the legal consequences of such activity.  In addition, Defendant's invitation to tour his "house" and his reference to "contraband" do not necessarily defeat an inference that he possessed firearms, ammunition, or explosive materials in a hidden location elsewhere on his property.

I also find no merit to Defendant's contentions regarding the perceived inconsistency between Deputy Starr's affidavits and Deputy Beatty's police report with regard to the location attributed to the improvised explosive device found on January 6, 2006.  Regardless of whether that device was found on the shoulder of the roadway directly opposite from the

entrance to Defendant's driveway (at #6 Lost Valley Loop) or "at the driveway entrance," the fact remains that the device was found close enough to Defendant's property for the deputies to make an association with that property, especially considering the previous reports from CC1 about an "explosion of great amplitude" emanating from Defendant's property several months earlier. Due to the relatively low population density and large lot sizes in the neighborhood where Defendant's property is located, the deputies were not presented with a situation where the explosive device was found in a common area adjoining several densely packed residences, any one of which could have been the source of the device.

Finally, I note that Defendant's offer of proof attempts to cast the evidence in the light most favorable to his defense and omits or misstates some of the information contained in this evidence. For example, Defendant's counsel refers to the location where the explosive device was found in January 2006 as being on Defendant's "curtilage," when the affidavit instead places the device "at the driveway entrance to 6 Lost Valley Lp." An unenclosed driveway entrance adjoining a public road and in full view of the public does not fit within the legal definition of a residence's "curtilage." See United States v. Tolase-Cousins, 455 F.3d 1116, 1121-24 (10th Cir. 2006).

The police reports that Defendant has offered in support of his contentions regarding the neighborhood feud with Mr. Ervin also contain information that would have given further support to a finding of probable cause. For example, the police reports state that Mr. Ervin heard gun fire coming from the direction of Defendant's property on two Sundays in

September 2005 [Ex. C to Doc. 25], that Mr. Ervin had moved out of his residence at least a month prior to November 9, 2005 [Ex. D to Doc. 25], and that Defendant appeared to be mentally ill and was behaving erratically when deputies came to see him on November 25, 2005 [Ex. E to Doc. 25].  In assessing Defendant's offer of proof, the Court is not required to extract the information from these exhibits which is favorable to the defense and disregard all the remaining information which corroborates or lends further support to Deputy Starr's affidavits.  The Court cannot reach the conclusion that Deputy Starr recklessly omitted or misstated information in his affidavit by adopting a contorted view of the evidence which itself omits or misstates information favorable to the Government's position.

For these reasons, I conclude that Defendant's offer of proof, whether considered individually or cumulatively, fails to meet the standard that is required to grant an evidentiary hearing under the framework articulated in Franks, 438 U.S. at 171-72.  I further conclude that the affidavits dated January 10, 2006, provided a substantial basis for Judge Blackmer's finding of probable cause to support the issuance of the warrants for Defendant's arrest and the search of his residence on that date.

Defendant's next argument is that even if the affidavits are accepted as true, they are insufficient to justify the issuance of a search warrant or an arrest warrant because the allegations of criminal activity contained therein are stale.  On this point, the Tenth Circuit has stated that:

> A search warrant may not issue if based upon information that has grown stale, i.e., information that no longer supports an affidavit's underlying assertion that the item sought will be found in the area or location to be searched.  However,

timeliness and relevance cannot be judged solely by the days of the calendar. Rather, "whether the information is too stale to establish probable cause depends on the nature of the criminal activity, the length of the activity, and the nature of the property to be seized." When the circumstances suggest ongoing criminal activity, the passage of time recedes in importance. We have also noted that otherwise stale information may be refreshed by more recent events.

United States v. Cantu, 405 F.3d 1173, 1177-78 (10th Cir. 2005) (quoting United States v. Snow, 919 F.2d 1458, 1460 (10th Cir.1990)) (additional citations omitted).

Applying these factors, the information contained in Deputy Starr's affidavits, when considered in its totality, was not stale at the time the warrants were issued and executed in January 2006. As in Cantu, 405 F.3d at 1178, the concerned citizens' observations reported in the Fall of 2005 had been refreshed by more recent information, including the deputies' visit to Defendant's residence on December 29, 2005, the pipe bomb found near the property on January 6, 2006, and the continuing stream of "electronic correspondence" from Defendant's neighbors "expressing increased fears and concern regarding the escalation of [Defendant] McLellan's threats and harassment." [Ex. F, G to Doc. 25.] It is also important to note that the criminal activity under investigation was the possession of firearms, ammunition, or explosives by a convicted felon. By its nature, this activity is ongoing, and the property to be seized is of a relatively permanent or stable nature that the deputies could reasonably expect Defendant to keep or retrieve for a significant period of time.

Viewing all of the above factors under the "totality of the circumstances" approach articulated in Gates, 462 U.S. at 233, I conclude that Judge Blackmer had a substantial basis for finding that the information supplied in Deputy Starr's affidavits was not stale. Even if

such a substantial basis to support Judge Blackmer's findings is lacking, I also conclude, in the alternative, that the deputies' preparation and execution of the warrants falls under the "good faith" exception to the warrant requirement articulated in United States v. Leon, 468 U.S. 897 (1984).  See Danhauer, 229 F.3d at 1006-08.

The good-faith exception recognizes that the purposes of the exclusionary rule are not served by suppressing the fruits of a search conducted pursuant to a warrant issued in error by a neutral and detached judge where the law enforcement officer who obtains and executes the warrant has done so in good faith.  "Penalizing the officer for the magistrate [judge's] error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations."  Leon, 468 U.S. at 921.  The Court already has determined that Defendant did not make a sufficient showing to require an evidentiary hearing regarding whether Deputy Starr acted in bad faith by knowingly (or with reckless disregard for the truth) supplying false or misleading information in his affidavits.

In addition, the above discussion of why the affidavits provided a substantial basis for Judge Blackmer's findings in support of the warrant precludes a determination that Judge Blackmer wholly abandoned his judicial role or that the warrants and accompanying affidavits are so facially deficient or lacking in indicia of probable cause that the agents who executed the warrants could not have reasonably believed they were valid.  Cf. Dannhauer, 229 F.3d at 1006-07 (listing circumstances in which the good-faith exception does not apply).  While it is always possible for a lawyer to argue, with the benefit of 20/20 hindsight, that an affidavit could have been more carefully worded or included greater detail, any

-22-

technical deficiencies in this regard do not add up to the kind of obvious substantive defect recognized in United States v. Gonzales, 399 F.3d 1225, 1231 (10th Cir. 2005). For these reasons, the "good faith" exception to the warrant requirement applies in the event that Judge Blackmer erred in finding probable cause.

Because I conclude that the preparation, issuance, and execution of the warrants at issue in this case did not violate the Fourth Amendment, it follows that Defendant may not rely on the "fruit of the poisonous tree" doctrine as a basis for suppressing any evidence or statements subsequently obtained as a result of the warrants' execution. "A party seeking exclusion of evidence on Fourth Amendment grounds must demonstrate both actual police misconduct that violated the defendant's Fourth Amendment rights, and that the evidence to be excluded was in fact a product of the police misconduct." United States v. Williams, 356 F.3d 1268, 1272 (10th Cir. 2004) (citing United States v. DeLuca, 269 F.3d 1128, 1132 (10th Cir.2001) and United States v. Nava-Ramirez, 210 F.3d 1128, 1131 (10th Cir.2000)). "'Only if the defendant has made these two showings must the government prove that the evidence sought to be suppressed is not "fruit of the poisonous tree," either by demonstrating the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the  taint of the unlawful conduct.'" DeLuca, 269 F.3d at 1132 (quoting Nava-Ramirez, 210 F.3d at 1131) (citations omitted). See Williams, 356 F.3d at 1273 (citing Wong Sun v. United States, 371 U.S. 471, 487-88 (1963)).

In this case, Defendant has failed to make either of the two showings required to invoke the "fruit of the poisonous tree" doctrine.  Apart from the challenge to Deputy Starr's affidavits and the warrants issued by Judge Blackmer which are discussed above, Defendant provides no evidence or authority in support of any other basis for suppressing the evidence obtained as a result of his arrest or the search of his property on January 11, 2006.

## III.   CONCLUSION

For the foregoing reasons, the preparation, issuance, and execution of the warrants for Defendant's arrest and the search of his residence in January 2006 did not violate the Fourth Amendment, and there is no basis for excluding any of the evidence subsequently obtained as a result of  the ensuing searches and seizures.

**IT IS, THEREFORE, ORDERED** that *Defendant Ian McLellan's Motion to Suppress, Request for a Franks Hearing, and Memorandum in Support Thereof* [Doc. 23] is **DENIED**.

**SO ORDERED** this 29th day of September, 2006, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge

-24-